We'll hear argument next in No. 20-1273, Pharmaceutical, Inc. v. Hospira, Inc., Mr. Maloro. Thank you, Your Honor. May it please the Court, Thomas Maloro for the appellant, Hospira. The judgment from the District Court of infringement of the patents in suit should be reversed, and I'll address two errors from the District Court's ruling in my argument. First, the Court improperly found that the 9 mg per milliliter of sodium chloride in Hospira's antiproduct meets the claim limitation of about 6 to 8 mg per milliliter of a tenacity regulating agent. Second, the Court improperly found that Hospira is likely to sell a product that contains the claimed amount of transition metal complexing agent, that is, 0.01 to 0.4 mg per milliliter. Starting with the tenacity regulating agent errors, in applying the claim limitation to the accused product, the District Court ignored evidence which establishes that 9 mg per milliliter cannot be within the scope of the claim. The 991 prosecution history confirms from par zone statements that 8.5 mg per milliliter is outside the scope of the range of about 6 to 8 mg per milliliter. That can be found at appendix page 3958. The application that was at issue there, the 991, has the same disclosure with regard to tenacity regulating agent as is present in the patents in suit, and that disclosure can be found at page 3674 of the appendix. Mr. Melora, this is Judge Toronto. What you're relying on now, this application, sounds rather like a basis for a claim construction argument, not so much like a basis for an argument that a factual determination under the unchallenged claim construction can go only one way. So can you address that? Yes, thank you, Your Honor. And to be clear, we are not making a claim construction argument here. We are disputing the court's analysis under the second prong of the infringement test, which is the application of the claim to the accused product. The word about was agreed by the parties to mean approximately, and the court purported to apply that construction. In applying that construction, of course, all relevant evidence ought to be used by the court in determining whether 9 meets the limitation of about 6 to 8. And so this evidence is evidence that's relevant to whether the claim can extend to 9, because, of course, if the claim can't extend to 8.5, then it can't extend to 9. But to get to the point of clear error, you have to get beyond saying that this would be relevant, right? You have to get to the point that allows this court to say that the bottom line finding of fact, the application of the construction to the evidence is clearly erroneous, taking into account perhaps what you've been relying on, but also the expert testimony of Parr. The court did commit clear error in this circumstance, because if the claim can't extend to 8.5 and doesn't extend to 8.5, it can't extend to 9. And the prior art, which taught 8.5, was prior art which, in fact, is physiologically compatible, which was the basis for the district court's ruling. There was a range of so-called osmolality that was specifically identified in the appendix by Parr at 3958 for the prior art. And that range is essentially the same. It's very similar to the range that Parr's expert identified as physiologically compatible for his infringement analysis. So it's clear error to find that a claim can cover a 9 milligram per milliliter because it's physiologically compatible, but can't cover 8.5 milligrams per milliliter, which is physiologically compatible. That's clear error that the court made in that application of the claim to the accused product. Let's put aside for the moment the prosecution history argument, which may be only a claim construction argument, and talk about the cohesive decision and the question of how the court is supposed to address the claim limitation about. And if I understand correctly from the cohesive decision, you have to focus here on the upper limit, which would be 8, and talk about what the purpose of the upper limit is, as opposed to the broader question of what the purpose of the invention is or the claim limitation is. And in reading the record here, I don't really see that either expert addressed the question of why there is a limit here of 8, which would be the necessary inquiry to figure out whether something satisfies the about limitation in this context. Could you address that? I don't think either the patentees expert or your expert really addressed that question. The patentees, I don't think that either expert, Your Honor, addressed why was 8 chosen as the upper limit in the claim. That upper limit was part of the originally filed claims. The specification discloses that there are narrower or broader numerical ranges that were considered to be part of the invention. And the PAR expert didn't choose to really talk about the numbers at all, just talked about the function of physiological compatibility. It was Dr. Pinal, who was Hospira's expert, who talked about the stylistic context of the word about in a numerical range in a formulation like this. He didn't address the number 8 as the reason for the upper limit either, right? He did not discuss the reason why 8 was chosen. That's correct, Your Honor. He discussed what the word about does to a numerical range of about 6 to 8. And his testimony was that that is something which serves to distinguish, as you're looking at the claim, the numerical range that's written down in the claim versus other numbers that are not literally within 6 and 8, and how far does the word about go to one skilled in the art? Or how does one skilled in the art look at the word about in applying that to an accused product? Could we maybe, since we have limited time, unless one of my colleagues has further questions about this issue, I wanted to bring you to the second issue, and that is whether the and is infringing. And let's assume that we reject your contention that the and didn't set an upper limit. Is the fact that the and didn't seem to set a lower limit, that is 0.01, relevant in determining whether the and infringes? Meaning that the and didn't set that there had to be a minimum amount of, say, 0.01? Was that Your Honor's question? Correct. Yes, Your Honor. The and, because it doesn't have a specification that is an identified range of metals, therefore the and doesn't answer the infringement question. And the Glaxo standard of what is the product that Hospira is likely to sell is the standard the court should apply here. And the evidence was, the only evidence of what Hospira is likely to sell was the exhibit batches that Dr. Gokel examined and did his calculations on. And even under Parr's theory of the case, trying to translate from metals to transition metal complexing agents. Let me interrupt you because I think you're not quite understanding the question I'm asking. I understand what your theory is, but I'm asking you to assume that by referencing this industry standard, the and does set an upper limit for this transitional metal complexing agent. But the industry standard, as I understand it, doesn't set a lower limit, and the patent here does set a lower limit of 0.01. And I'm asking you, is the failure to set a lower limit significant for purposes of determining infringement? Thank you, Your Honor, for clarifying. Let me try again. The claim, which has a lower limit and an upper limit, is a claim to a transition metal complexing agent. It's a component in the product. It's not the metals itself. It's, in this case, Parr argues, citric acid. And for purposes of appeal, we're not contesting that they're going to argue citric acid. It's the amount of citric acid. And so there is no lower limit or upper limit of citric acid in Hospira's product, which acts as transition metal complexing agent. This is Judge Stoll. I hear where you're going with this, but I didn't think you challenged the methodology that was used based on the 30 percent upper limit to determine the amount of chelating agent or citric acid. So are you challenging that method now? No, Your Honor. On appeal, we are not challenging that if there were an upper limit of metals, Dr. Tost's calculation got him to an amount of citric acid that is within the claim. It rather is the fact that there's no specification for the amount of citric acid that is in the product as a transition metal complexing agent that yields inevitably to the Glaxo standard that the court must examine what is the product that Hospira is likely to sell. It has not specified the amount of transition metal complexing agent in its product, and therefore, Dr. Gokul, who examined the actual batches, examined the product that Hospira is likely to sell. And Dr. Tost, who is the PAR expert, admitted that he saw no evidence that the actual Hospira product contained anywhere near the level of metals that would be required to support his calculations. So I'm into my rebuttal time. If there are further questions, I'm happy to entertain them. Otherwise, I would reserve the remainder of my time for rebuttal. All right. We'll give you the three minutes for rebuttal unless my colleagues have further questions. Nothing now, thank you. Okay. Thank you. Mr. Brown? Good morning, Your Honors. May I please the court? Could you start out by addressing the question that I was asking about this first issue and the cohesive case? As I understand the cohesive case, that would require an examination of the purpose of the eight, the upper limitation of eight. And that, in fact, we have a record here in which neither expert nor the district court asked what the purpose of the eight limitation is and related that to the question of nine falling within the about range. Did your expert address the reason for the upper limit of eight?  Our expert, Dr. Elder, he addressed the purpose. I want to answer this as accurately as possible. He explained that there were two purposes for the about range, which is as you add other ingredients to the formulation, the osmolality is a function of everything you put in. That's not the question I'm asking. He did address the purpose of the about limitation, but as I understand the cohesive case, it requires that you address the purpose of the upper limit of eight. And I don't see that your expert addressed that question. Tell me why I'm wrong about that. I think that that's implicit in his discussion about the fact that you're adding it on top of the other ingredients to the formulation to result in a physiologically acceptable tonicity. There's another important factor in the cohesive analysis. There are two things the court considered, which was the purpose and the criticality. In other words, in cohesive, they compared the limitation about 30, and that was critical in getting past prior art discussed in the specification that was around 20. And they said, well, below 23 point something or other, you don't get the function. So it was critical. The district court addressed the criticality here and said the tonicity regulating agent is not critical. The district court sat through four days of trial on invalidity challenge by Hospira and heard the inventors talk about all they had to do to solve the longstanding decades old problem of instability of liquid formulations of epinephrine. And they did it by balancing things that weren't the tonicity regulating agent. You're getting off the point that I'm asking about, and that is the question of whether there is any testimony as to the purpose of the eight upper limit. And what I hear you saying is that there is no such testimony, but that somehow it's implicit in the testimony. Am I correct about that? I believe it is implicit in his testimony that we cited in our brief that it's intended to encompass two factors, the addition of additional ingredients and the fact that you can have different tonicity regulating agents with different molecular weights. And so I think that is the purpose for the upper limit, and the specification itself provides the purpose for the element. And I think given that combined with the finding on lack of criticality, in fact, says that there isn't something critical. And that's exactly what about was intended to encompass in that if you look further into the cohesive, the analysis they provide is essentially identical to a doctrine of equivalent analysis. Can I challenge that? This is Judge Toronto. Can I ask what may be a different question, a variation of the question, or the same question? I'm not sure. That at least implicit, maybe even explicit, I don't know, in an explanation of what the six to eight is doing, and just tell me if this understanding is wrong, which it may well be, is that if you have less than that, the cells will implode, and if you have more than the upper range, they'll explode, or vice versa. Is there something like that that is going on in your expert's explanation of the function of six to eight, so that maybe implicitly he is saying why not to go above eight? Yes, Your Honor. And so he explained, and it was the vice versa, if you get too low of tenacity, your cells explode. If you get too high, they shrink. And when you put other ingredients in before you put in the tenacity regulating agent, those other ingredients increase the tenacity. So the more other ingredients you put in, then you're going to adjust your tenacity regulating agent accordingly. And so that is the purpose of the range, is to provide a physiologically acceptable tenacity. And it's important here, I want to emphasize the court's finding on criticality, however, because that becomes very important. You don't want to penalize a patentee or allow or truncate about with respect to the least important limitations. And here there was an extensive record on the other limitations being critical and this one not being critical. That's not the question. The question is about the eight limitation, not about whether this particular overall claim limitation is important or unimportant. And so I don't see that there's any testimony about whether the eight limitation is critical or not critical in terms of the tenacity regulating agent. Your Honor, I think with respect to the criticality testimony that was at trial, there was extensive evidence that went into that. And in particular, the submission of the waiver request by Hospira to the FDA focused on a comparison to our- Can you show me any testimony in which the criticality or relevance of the eight limitation is discussed by your expert? I don't see it. Am I missing something? He talked about the entirety of the range. He talked about the entirety of the range in his testimony and what the function of the about six to eight, the entirety of the numerical range. I do not interpret cohesive as requiring a specific testimony regarding the specific endpoint. I think they focused on it because that's where the criticality lie and the transition went into the criticality of the element. Here, there's not a criticality of the end of the range. Dr. Elder testified that as you go up, it's not like going off the deep end of a pool. It's a gradual change in tenacity until you get to a point where you're too high. He said it's a gradual effect and that he didn't call out the number eight specifically, but that's because there's no criticality to that number. His testimony clearly establishes that point and makes the district court's fact-finding clearly supportable under the clear error standard. This is Judge Stoll. I think you mentioned, I think you said Dr. Elder's testimony, at least that's what I was looking at for this. Just to make sure I understand exactly where you're pointing to, are you pointing to pages, around pages A157, 158, or where else are you pointing to for your reliance on the fact that he, or where you're saying that he discussed, you know, the criticality of the range and saying that you could go outside of the scope of six to eight in order, and still not have imploding or exploding? So, the citation I have is appendix pages, I think I have 155 to 161 and 214 and 215. Let me just check those quickly. So, the first citation I had of 155 to 161, that is his direct examination. And, for example, on page 158, the question is, is there a specific cutoff number for isotonicity? Not specifically. I mean, the range cited in the literature is 225 to 350, but that doesn't mean that at 224 all the blood cells will begin bursting or shrinking above 350. It's a gradient that some of the cells will be more sensitive to than others, and also the time of exposure will play a role. So, we use the range that's typically cited in these references as the range we shoot for in developing isotonic formulations. And so, the tonicity that he's citing there is a function of how much of the tonicity regulating agent you have added to the formulation. And so, that is in his discussion of the purpose of the claimed range. And then, similarly, on 214 and 215, I believe that's in the cross-examination. And I don't see that as relevant. It's, again, talking about the function, though, and the criticality of the tonicity element and the purpose of it. Okay. Thank you. This is Jeff Toronto. Oh, I'm sorry. I was going to change the subject to the other issue that was raised by Mr. Maloro, if I could. So, as I understand the issue there, the ANDA, let's say by assumption, says we are not going to go above 30 percent of these particular kinds of metal impurities, but we can go up to 30 percent, and if we can go up to 30 percent, I think your expert said, we can then quickly calculate how much of the citric acid will act as a chelating agent for those, and that puts you into the claimed range of the chelating agent. I understood that Mr. Maloro's response to that was that the Glaxo decision says, don't look at what the ANDA permits you to do, but what the product is likely to be, and the evidence is that what the product is likely to have is something very much below the 30 percent, which would then translate into too small amount of the citric acid as a chelating agent. If that understanding is right, maybe you can correct me in my understanding of what the argument is, but what is your response, including about the Glaxo standard? Certainly, I believe you have correctly, Your Honor, I believe you've correctly summarized Hasbiro's argument in the case, and here we think that the court's subsequent Synovian decision controls for several reasons, and the Synovian explained the Glaxo decision specifically, and in Synovian, this court held as a matter of law that a defendant and a product specification that had a range of, I think, less than .6 infringed as a matter of law a claim requiring less than .25 of a particular thing, and said that you did not get to come in and try to show a likelihood scenario when your ANDA request encompassed the claimed range, and that's precisely what we have here, and in fact, in this case, we argued, we tried to get the very samples that Hasbiro tested. Hasbiro came into court and explicitly argued Synovian is all you need to look at in this case. You do not need to look at the actual batches. You do not need testing from these batches, and the court made a fact finding. It's on appendix page 39. First of all, the court found that the metal content was variable and not subject to control. I think you're getting off point here. Forget about the testing. I think the question that Judge Toronto is asking, and the question that I have also, is are we under Synovian here in terms of the ANDA itself, and Synovian does seem to be different in the sense that the limitation is less than a certain amount, whereas this patent has a range between X and Y, and even accepting your argument that the industry standard translates into the upper range being permitted by the ANDA to be within the patented range, I don't see that there is anything in the ANDA which sets a lower range that would satisfy the lower range of the patent. Could you address that, please? Certainly. The basis for Synovian, Your Honor, is simply if the ANDA range encompasses the claimed range. There's no importance given that I can see to the idea of an upper or lower. The ANDA in Synovian had a broad range, and the patent had a narrower subset of that. Here we have the same thing. The ANDA has a range of 0 to 30%. We have a range that overlaps with that. They are allowed if they are approved. That is the holding of Synovian. If they are approved, they are allowed to sell a product that falls within the claims. That is infringement as a matter of law under Synovian. Thank you, Your Honors. Okay, any further questions? Okay, hearing none, let's go back to Mr. Malora, who has three minutes for rebuttal. Thank you, Your Honor. Starting with the Synovian issue that the court was just asking about, Synovian endorses that where the ANDA does not reveal whether the product will infringe, Glaxo is the standard. And here, the ANDA does not reveal whether Hospira's product will infringe. And as the court pointed out, the range that is set in the patent claim for transition metal complexing agent, it is not found in the ANDA, nor even using metals as a proxy would one find that there is a revelation in the ANDA that the product will infringe. There is a lower and upper bound to the claim, and yet all the ANDA says is that there were tests done that showed very low levels and, therefore, there's no need to test the product as it's released, that commercial batches are made, because these levels are so low that the product that Hospira is likely to sell will not be subject to any drug product testing. So here, essentially, Synovian says Glaxo is still good law, it's just that where the ANDA reveals that there will be infringement or non-infringement, then that will control, but we don't have that situation in this case. Just as an aside, the samples issue was really a red herring at best. The samples were being sought for something else, never sought for metals. The Synovian argument that was at issue there had to do with other impurities, and there was never a request to test for metals, because the tests had already been done and reported, and those were the tests that Dr. Gokel had used. As far as the – Mr. Maloro? Yes. This is Judge Stoll. I wanted to ask you a question. Am I able to look at your ANDA, and I see that there's that, you know, Judge Dyk asked you earlier to assume the ANDA does set an upper limit of 30%. Is it fair for me to assume a lower limit of zero? There are metals in the Hospiro product, and so I don't think it's fair to assume a lower level of zero. There were metals that were seen, there were metals that will always be in the product, and there was no lower limit established for what they could go below. So I think factually zero would not be an appropriate lower limit. And then the alternative is that if the upper limit is 30, then does there really have to be a range in the ANDA, or is it sufficient that the ANDA would allow some amount of range that falls within the claim, or even if it's a single number? We would, of course, dispute that 30 is an upper limit, but because there is nothing on the lower end, then the Glaxo standard of what is Hospiro likely to sell should be the analysis in our view. Okay. Thank you. Okay. Any further questions? Nothing for me. Thank you. Okay. Thank you, Mr. Maloro. Thank you, Mr. Brown. The case is submitted.